**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| **WISH ATLANTA, LLC,** | * | |
| **Plaintiff,** | * | **CIVIL ACTION FILE NUMBER** |
| **v.** | * | **4:14-CV-00051-CDL** |
| **CONTEXTLOGIC, INC.,** | * | |
| **Defendant.** | * | |

## PLAINTIFF'S TRIAL BRIEF

### INTRODUCTION

This case was filed as a result of the Defendant's infringement on the Plaintiff, Wish Atlanta, LLC's ("Wish") Wish Trademarks and the subsequent refusal of Defendant to remedy the situation after being provided a Cease and Desist notice.  Defendant utilizes the exact same Mark for the exact same products and Plaintiff has first-hand evidence of actual customer confusion.  It is difficult to envision a clearer case of infringement and consumer confusion than the present case.

### FACTS

The evidence to be presented at trial will show the following:

Wish is in the business of selling "street-wear" and ready to wear for men and women including hard-to-find brands and a lot of sneakers.  "Street-wear" is not a type of clothing that is only worn by a certain segment of the population.  Indeed, the evidence will show that young and middle-aged people of all types and walks of life purchase and wear items which may be classified as "street-wear".  Wish sells apparel and other items including: Apparel, Tops, Bottoms, Shirts, Blouses, T-shirts, Pants, Shorts, Sweat suits, Socks, Sweatshirts, Jackets,

Sweaters, Coats, Hats, Gloves, Dresses, Suits, Skirts, Vests, Neckwear, Headwear, Footwear, Underwear, Lingerie, Ties, Scarves, Jeans, Swim wear, Pajamas, Robes, Footwear, Handbags, Eyewear, Headwear, Cosmetics, Jewelry, Toiletries, House wares, Watches, Magazines, Books, Skateboards, Candles, Candle sticks, Cologne, Eu de toilet, Plates and Posters both at its retail and on its online store under its Wish Mark.  Wish also sells handbags, eyewear, headwear, cosmetics, jewelry, toiletries, housewares, watches, magazines, books, skateboards, candlesticks, cologne, plates, and posters under the Wish Mark.

Wish is the owner of federal and common law trademarks rights in and to the trademark "Wish" (the "Wish Mark") pursuant to U.S. Trademark Registration Nos. 3783165 (IC025 and IC035 – for the retail store – filed May 18, 2007, published for opposition February 16, 2010, registered May 4, 2010) and 4242361 (IC035 – for the Internet Store, filed February 23, 2010, published for opposition February 8, 2011 and registered Nov. 13, 2012).  These Registrations cover the items sold by Wish.

Defendant Contextlogic, Inc. ("Defendant") is a California Corporation that is in the business of operating a website and telephone application ("app") which is a virtual shopping mall that recommends products based upon its users history of viewing products and purchasing products where a user can create wish lists, recommend products, window shop and buy things. Through that app, among other things, Defendant sells many of the same products Wish sells under the Wish Mark.

Wish was purchased by Lauren Amos in November of 2004. Lauren had a vision of creating a top tier boutique that sold product that was highly sought after with very limited distribution. In order to attract top tier vendors, Lauren developed a business plan and strategy that included a build-out of the 2800 square foot space which included a financial investment of

almost ███████ which is a very heavy investment given the square footage.  At the same time

that the buildout was being complete, Wish was out pitching to vendors with amazing product –

vendors who are very selective about who they will permit to sell their products. This was a very

difficult task and took a lot of convincing. Wish was able to gain a top tier account with Nike,

Jordan, Adidas, Comme de Garcon, Original Fake, Just Don and other coveted brands. They sold

to Wish their most coveted product that they only sell to approximately a dozen boutiques across

the country. From these initial connections, Wish was able to access most all limited product

both domestically as well as internationally. Wish sells $650 baseball caps and shoes that

customers camp in front of its store to purchase as they can't find them anywhere else.   Wish

has worked very hard to maintain the integrity of its brand. There are many brands of

merchandise that Wish could purchase and turn very quickly in order to increase profit

temporarily. However, Wish resists that temptation as it would damage its brand that it has

worked so hard to develop.    When Lauren Amos purchased Wish in 2004, in addition to the

███████ investment in the physical retail store, she changed the entire concept to include the

logo.

Wish promotes the Wish Mark through social media, events, product collaborations in the

store, stickers, sticker packs, buttons, www.wishatl.com, Instagram, Facebook and Twitter

among others.

The wish ap and Contextlogic's website sells items for third-parties which are

recommended to its users and/or put on "wish lists" by users.  The sale of these goods is the <u>only</u>

way it generates revenue.  Contextlogic's wish app and website sell clothing and shoes.

Contextlogic sells sneakers, shirts, jackets, pants and baseball caps on its website and app.

Contextlogic sells streetwear on its website and app.  On the front page of Contextlogic's

website, as of March 19, 2015, of the 30 items pictured for sale, all but 4 featured apparel or

footwear, and the other 4 featured a watch, bracelet, handbag and earring.  Moreover, of those

items, many would fall under the category of "street-wear".  In other words, all of the items

featured on www.wish.com by Defendant were items Wish sells under the Wish Mark.

It is abundantly clear why Defendant was granted a registration despite the existence of

Wish's Registered Marks – Defendant did not obtain Trademark protection for the sale of any

goods, let alone the goods sold by Wish under its Mark.  Therefore, the examiners did not have

any reason not to allow Defendant's Mark to be registered.  Defendant's registrations simply

provide it protection for an app and nothing else.

Contextlogic has two trademark registrations for its "wish" mark.  The first was obtained

April 2, 2013 with a first use in commerce of November 20, 2011 and its application was filed on

March 27, 2012.

The description in the "for" line for Defendant's first Registration does not reference the

selling of goods and the CEO of Defendant testifies that it is unclear to him whether the term

"enabling users to track selections and purchases" contemplates the sale of goods which is the

way Contextlogic generates revenue.

The second was obtained April 2, 2013 with a first use in commerce of November 20,

2011 with its application filed on March 27, 2012.   The description in the "for" line does not

reference the selling of goods.

The issue of consumer confusion in this case and the need for an injunction is evidenced

by the fact that Contextlogic terminates ██████████ of its merchants (those who sell items on

Contextlogic's app and website) due to violation of Contextlogic's Merchant policies per month.

Contextlogic currently has over ██████ vendors on its app and website.   Contextlogic receives

approximately ██ customer e-mails regarding orders and ██ tickets (which involve issues

with product and/or shipping) per day in its customer service department.  Approximately ██

percent of those inquiries involve shipping issues.  Contextlogic deals with ██ disputes

between customers and merchants per day.

   A year-and-a half prior to March of 2015, ██ percent of Contextlogic's sales were

fashion related.   Approximately ██ of Contextlogic's revenue was from fashion related items

in Fiscal year 2014.  Contextlogic earned approximately ██████ in revenues for Fiscal Year

2014.

   Contextlogic does not provide a customer service phone number on its website.   CIT

Group, a factoring Company contacted Pam Sutter, CEO of Wish regarding a large invoice that

was incorrectly attributed to Wish and should have been sent to Contextlogic.

   In or about November of 2013 Wish began to receive calls from individuals about orders

they had not received who intended to contact Contextlogic but instead contacted Wish.[1]  These

---

[1]      Wish acknowledges the Court indicated what the callers said on the calls could not be
presented for the truth of the matter asserted.  Wish will have live testimony from callers at trial.
With regard to the other callers, testimony about confused consumers has been determined by
Circuit Courts to be admissible because it is not offered to prove the truth of the matter asserted,
i.e. it is not offered to show that the Plaintiff and Defendant are the same business, but, rather
that the caller thought they were the same business.  Armco, Inc. v. Armco Burglar Alarm, 693
F.2d 1155, 1160 (n.10)(5th Cir. 1982); This circuit has affirmed the admission of such evidence
without even considering any hearsay issue.  University of Georgia Athletic Ass'n v. Laite, 756
F.2d 1535, 1546 (11th Cir. 1985).  The Northern District of Georgia, as recently as 2014
permitted this type of evidence.  Ewe Group, Inc. v. The Bread Store, LLC, 54 F.Supp.3d 1343,
1350-51 (N.D. Ga. 2014).  Defendant cited Angel Flight of Georgia, Inc. v. Angel Flight
America, Inc., 522 F.3d 1200 (11th Cir. 2008) stating that the Eleventh Circuit determined that
the district court exceeded the use of an employee's testimony about customer confusion when it
admitted it under FRE 803(3) to show the customer's "confused" state of mind, but recounted the
testimony as actual fact—i.e., that the incidents described to the employee by the customer
actually took place.  The Eleventh Circuit actually stated just one line down that "What [the
parties] overlook, however, is that although the evidence of actual confusion occupied a large
portion of the district court opinion, it was largely superfluous to the court's ultimate finding of
infringement."  In other words, did not render an opinion on way or the other as to the propriety

calls came to either Jasmine Boston or Craig Maddox, who were both employed by Wish at the time.  These individuals who made the calls did not possess order numbers for Wish and their names did not match anything in Wish's system and after discussion, the individuals state they ordered from the "Wish app".  On some occasions, the persons told Craig Maddox that he was a "liar" and "screwing them out of their money" not believing they contacted the wrong "Wish".  The calls became more frequent and took Craig Maddox on average 8-10 minutes on each call, taking away from his ability to do his job.

All of the misdirected calls fielded by Craig Maddox  and Jasmine Boston were directed towards Contextlogic as all of the callers indicated they had ordered their items on the "Wish app".  Neither Mr. Maddox, nor Ms. Boston has ever heard of any of the other "Wish" entities which Defendant will reference at the trial.  At least some of the calls to Wish which were intended for Contextlogic involved items being ordered which were carried by Wish. On occasion, some of the callers were irate and did not understand that Wish was not Contextlogic. The individuals who called Wish intending to call Contextlogic indicated that they had already attempted to contact Contextlogic's e-mail address and had not gotten a response for two to three weeks.  More than once or twice per day during the holiday season, Wish received e-mails which were intended for Contextlogic.

There are two lists maintained of some of the calls that were made to Wish which were intended for Contextlogic.  There were additional calls which were not logged onto the list. Plaintiff has received numerous phone calls from individuals which were intended to Contextlogic who claim to have not received their order, have received the wrong item, or have

---

of the district court's use of the employee's testimony because it was largely irrelevant to the district court's holding and did not disaffirm or contradict University of Georgia Athletic Ass'n v. Laite.

received part of their order only. Plaintiff's representatives, either Jasmine Boston or Craig Maddux received the various phone calls. Such calls during the holidays were generally 4 to 5 per day. After the holidays, there have been no fewer than 3-4 calls per week. There have been approximately 100 to 150 calls. The calls generally begin with a customer who is unhappy about lack of receipt of an order. That customer then gives an order number that is not one affiliated with Plaintiff. In the initial call, Jasmine Boston, before figuring out that the call was intended for Defendant would ask the customer how that customer got the number. The customer stated that they had attempted to e-mail support@wish.com and could find no phone number to call. The customer, confusing Plaintiff's and Defendant's websites obtained the number for Plaintiff. After several phone calls, Plaintiff's representatives realized the customers were attempting to call Defendant. All of the misdirected calls were intended for Defendant. In addition to those who call, there are individuals who have come into the Brick and Mortar Store confused. This has occurred approximately 1-2 times per month this year.

On or about February 10, 2014, Plaintiff's counsel sent a Cease and Desist Letter to Defendant demanding that Defendant cease using the "wish" mark which was received as indicated by the signed receipt card.  Defendant has continued to use its wish mark since receipt of the Cease and Desist letter and to present and has taken no action to remedy the consumer confusion.

## ARGUMENT AND CITATION OF AUTHORITY

### 1.  Contextlogic Has Infringed on Plaintiff's Wish Mark.

"Under § 32(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a), liability for trademark infringement occurs when a person 'use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark' which 'is likely to cause confusion, or to cause mistake,

or to deceive.' " PetMed Express, Inc. v. MedPets.Com, Inc., 336 F.Supp.2d 1213, 1217

(S.D.Fla.2004) (quoting 15 U.S.C. § 1114(1)(a)). To prevail on a claim of trademark

infringement, then, a plaintiff must plead and prove that: (1) it has a registered mark; (2) the

defendant, without permission, used its mark in commerce; and (3) the defendant's mark is likely

to cause consumer confusion. Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc., 303

F.3d 1242 (11th Cir.2002); Frehling Enter., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330 (11th

Cir.1999)).

      Seven factors apply in this circuit to determine whether customer confusion is likely to

occur under the Lanham Act.  The factors are (1) type of mark, (2) similarity of mark, (3)

similarity of the products the marks represent, (4) similarity of the parties' retail outlets and

customers, (5) similarity of advertising media, (6) defendant's intent, and (7) actual confusion. Of

the seven factors, the type of mark and the evidence of actual confusion are the most important.

Caliber Automotive Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC, 605 F.3d 931, 935

(11th Cir.2010)(citing Frehling, 192 F.3d 1330 at 1335); Freedom Sav. & Loan Ass'n v. Way,

757 F.2d 1176, 1186 (11th Cir.1985).  "[N]o single factor is dispositive, but greater weight is

given to the type of mark and evidence of actual confusion." Dieter v. B & H Indus., 880 F.2d

322, 326 (11th Cir.1989).

      It is undisputed that Plaintiff's Wish Mark is registered and that Defendant does not have

permission to use the Wish Mark from Plaintiff.  Accordingly, the only remaining issue the

Court must analyze on the issue of infringement is whether Defendant's Wish Mark is likely to

cause consumer confusion using the seven (7) factors applied in the Eleventh Circuit.

i.     Type of Mark.

"There are four recognized types of mark, ranging from weakest to strongest: generic, descriptive, suggestive and arbitrary. The stronger the mark, the greater the scope of protection accorded it." Caliber, 605 F.3d at 938 (quoting Aronowitz v. Health–Chem Corp., 513 F.3d 1229, 1240 (11th Cir.2008)). "An arbitrary or fanciful mark bears no logical relationship to the product or service it is used to represent, [e.g., Kodak]. A suggestive mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product, [e.g., Penguin Refrigerators]. A descriptive mark identifies a characteristic or quality of the service or product, [e.g., Vision Center]." Id. at 939 (alteration in original) (quoting Welding Servs. v. Forman, 509 F.3d 1351, 1357–58 (11th Cir.2007)). A generic name refers to "a particular genus or class of which an individual article or service is but a member." It is the "term by which the product or service itself is commonly known" and "depicts the product or service as a whole, rather than any particular feature, quality, or characteristic of the whole." Welding, 509 F.3d at 1358 (citations omitted) (internal quotation marks omitted). Whether a name is generic depends on the use of the term, not the term itself. "A word may be generic of some things and not of others: 'ivory' is generic of elephant tusks but arbitrary as applied to soap." Id. at 1358 (quoting Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1183 (5th Cir.1980)). The "generic use of a word may not be registered as a trademark." Id. (citing Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985)). Important in gauging the strength of a mark is "the degree to which third parties make use of the mark." The less third parties use the mark, "the stronger it is, and the more protection it deserves." Frehling, 192 F.3d at 1336 (citing John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 974–75 (11th Cir.1983)).

9

Clearly, in this instance, the Mark "Wish" is arbitrary.  There is nothing about the term "Wish" that would denote streetwear or clothing.  Accordingly, the Wish Mark is strong and entitled to maximum protection given its arbitrary nature.

      ii.    <u>Similarity of Mark</u>.

Similarity of mark is determined by "the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." <u>Caliber</u>, 605 F.3d at 939 (quoting <u>E. Remy Martin & Co. v. Shaw–Ross Intl. Imps., Inc.</u>, 756 F.2d 1525, 1531 (11th Cir.1985)).

In this case, the mark is the exact same word – Wish.  It sounds the same and uses the same four letters.  Both Wish and Contextlogic place their Marks prominently on their webpage.  While the shape of two the letters is slightly different, the Marks are identical in all other respects.

      iii.    <u>Similarity of Products</u>.

Whether there is a similarity of products requires the "determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." <u>Caliber</u>, 605 F.3d at 939–40 (quoting <u>Frehling</u>, 192 F.3d at 1338). In the Eleventh Circuit, the test is "not whether the goods could be distinguished, as they could be by any [consumer], but whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." <u>Frehling</u>, 192 F.3d at 1338.

Here, Defendant apparently claims that because it sells a broader selection of goods than Wish that its infringement is somehow excused.  That is not the case.  Contextlogic earned approximately ███████ in fiscal year 2014 and ██ of that was generated from clothing.

10

Contextlogic sells sneakers, shirts, jackets, pants and baseball caps on its website and app.  These are the items sold by Wish.  Moreover, Wish has protection both in the retail and in the internet sales of these products.  There is no authority for the proposition that just because Contextlogic sells products in addition to those sold by Wish it can violate Wish's duly registered trademarks.

      vi.    <u>Intent of the allegedly infringing party</u>.

The intent factor looks to whether the allegedly infringing party "adopted a plaintiff's mark with the intention of deriving a benefit from the [trademark holder's] business reputation." <u>Caliber</u>, 605 F.3d at 940.

In this case, Contextlogic has continued its infringement after being told to cease and desist and had constructive knowledge of Wish's Registered Mark since it was established.

      vii.    <u>Actual Confusion</u>.

Actual consumer confusion is "the best evidence" of likelihood of confusion. "All potential consumers of the relevant product or service, including middlemen, can inform the inquiry, and the ultimate consumers deserve special attention." <u>Caliber</u>, 605 F.3d at 936–37 (citations omitted). The rule courts usually apply is that infringement occurs when "there is a likelihood of confusion in the mind[s] of an appreciable number of 'reasonably prudent' buyers." <u>John H. Harland Co.</u>, 711 F.2d at 979 n. 22.  "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, while confusion of actual customers of a business is worthy of substantial weight."  <u>Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.</u>, 675 F.2d 1160, 1167 (11th Cir.1982) (citations omitted). "There is no absolute scale as to how many instances of actual confusion establish the existence of [actual confusion]." <u>Caliber</u>, 605 F.3d at 937 (internal quotation marks omitted) (<u>quoting</u> <u>AmBrit, Inc. v. Kraft, Inc.</u>, 812 F.2d 1531, 1543 (11th Cir.1986)). "While the [Eleventh Circuit has] no hard-

and-fast rule, under [its] standard the quantum of evidence needed to show actual confusion is relatively small." Id. at 937–38 (internal quotation marks omitted) (quoting Jellibeans, 716 F.2d at 845); World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 489 (5th Cir.1971); see Safeway, 675 F.2d at 1167 (finding that two instances of actual confusion were sufficient evidence of actual confusion).

In this circuit, "very little proof of actual confusion would be necessary to prove the likelihood of confusion." World, 438 F.2d at 489; see Roto–Rooter Corp. v. O'Neal, 513 F.2d 44, at 46 (5th Cir.1975) (confusion by four individuals held to be significant evidence of actual confusion). In Safeway, the Court considered the "kinds of issues confused and degree of confusion" involved and the weight to be given to the actual confusion shown. Safeway, 675 F.2d at 1167. The Safeway court concluded that where the incidents of actual confusion were small, and a supplier and a customer were confused, the confusion was deemed significant because customers and suppliers are the type of people who ought not to be confused. Id. at 1167.

In the present case, there have been well over 100 instances of confusion with customers who called Wish thinking it was Contextlogic.  Some of those customers refused to believe that Wish was not Contextlogic.  At least some of the calls related to items actually carried by Wish.  Individuals have also come into Wish's brick and mortar store  - 1-2 times per month, and sometimes as many as five per month.  One of Contextlogic's invoices was even mistakenly directed to Wish.  All of the callers indicated they had ordered their items from the "Wish app".  There is no evidence of any other "Wish App." other than the one operated by Contextlogic.  Even a vendor contacted Wish believing it to be Contextlogic.

The above facts show a consistent pattern of many customers who were confused and though that Wish was Contextlogic.  This case is on all-fours with <u>Safeway</u> – customers and vendors are not the type of persons who are supposed to be confused.   While the quantum of evidence required to show actual confusion is very small, in this case, there are numerous instances over a significant period of time of confusion.  Indeed, it is difficult to envision a case where the "Actual Confusion" factor could weigh so heavily in favor of the Plaintiff.

> viii.    <u>Weight of the Factors</u>.

Here each of the factors weigh heavily in Wish's favor.  Moreover, the two most important factors, type of mark and actual confusion weigh entirely in Wish's favor.  The weight of the factors in Wish's favor are such that Wish is entitled to prevail on its claims for Trademark Infringement under the Lanham Act.

> **2.    <u>Wish is Entitled to a Permanent Injunction Barring Contextlogic From Using the Mark "Wish".</u>**

The standard for permanent injunctive relief in the Eleventh circuit is set forth in <u>Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.</u>, 522 F.3d 1200, 1208 (11th Cir.2008).  In Angel, the Eleventh Circuit explained:

> a plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.

The court further reasoned that in "ordinary trademark infringement actions ... complete injunctions against the infringing party are the order of the day." <u>SunAmerica Corp.</u>, 77 F.3d at 1336.  The reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks—even in cases in which more than one entity has a legal right to use the mark.

13

Id. at 1336–37.  Id. at 1209 (quoting SunAmerica Corp. v. Sun Life Assurance Co. of Can., 77 F.3d 1325 (11th Cir.1996)).

The Eleventh Circuit explained that it has repeatedly held that " 'a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of ... [a] substantial threat of irreparable harm.' "  Ferrellgas Ptnrs., L.P. v. Barrow, 143 Fed.Appx. 180, 191 (11th Cir.2005) (brackets in original) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1310 (11th Cir.1998)). The court also pointed out that other circuits are in accord on this issue, citing cases from the First, Second, Third, Seventh, Eighth and Ninth Circuits.

The Eleventh Circuit has also noted that "our prior cases do extend a presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim." N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1227 (11th Cir.2008). In its opinion, the court referenced its earlier decision in Tally–Ho, Inc. v. Coast Community College Dist., 889 F.2d 1018, 1029 (11th Cir.1989), in which it stated, "it is generally recognized in trademark infringement cases that (1) there is not adequate remedy at law to redress infringement and (2) infringement by its nature causes irreparable harm."

In this case, as stated above, it is clear that Contextlogic is infringing on Wish's mark. As noted in the case law, that infringement and the actual confusion that has occurred amongst consumers is enough in and of itself to demonstrate the lack of an adequate remedy at law and irreparable harm.  However, there is additional evidence of irreparable harm that is undisputed. Many of the calls that Wish is receiving for Contextlogic customers involve customers angry about not receiving their goods.  Additionally, Contextlogic deals with ████ disputes between customers and merchants per day.  Contextlogic terminates ██████ merchant accounts per

14

month for violating Contextlogic's merchant policies.  This is an extensive volume of complaints and non-compliant vendors – and given the public's confusion between the two parties' marks, this negative goodwill is being attributed to Wish because of Contextlogic's use of the Wish Mark.

The third prong in the analysis of whether injunctive relief is appropriate is a balancing of the equities.  With regard to the weighing of the equities, it is clear that the balance of the equities favors Wish.  Contextlogic is using the Wish Mark which is owned by Wish and customers are being confused by same.  Wish has expended significant sums of money and time on its Mark and its goodwill is being harmed by the fact that Contextlogic, a company that has several thousand customer complaints a day is using its mark and customers who are apparently unable to reach Contextlogic believe they are contacting Contextlogic when they are contacting Wish.

The final element in an injunctive relief analysis requires the consideration of the public interest: will the public be well or ill served by the issuance of an injunction?  As one court explained, "[i]n trademark cases, 'the public as a whole has a paramount interest not to be confused by defendant's infringement.' " Nailtiques Cosmetic Corp. v. Salon Sciences Corp., 41 U.S.P.Q.2d 1995, 1999 (S.D.Fla. Jan. 10, 1997) (quoting Council of Better Business Bureaus, Inc. v. Better Business Bureau of So. Fla., Inc., 200 U.S.P.Q. (BNA) 282, 301 (S.D.Fla.1978)). And the Eleventh Circuit points to "a long line of trademark cases in which this Court has explained the 'public interest' relevant to the issuance of a permanent injunction is the public's interest in avoiding unnecessary confusion." Angel Flight, 522 F.3d at 1209. Because the use of the Wish Mark by Contextlogic has and will continue to lead to confusion in the marketplace, the public interest is best served by Contextlogic being prevented from using the Wish Mark.

Wish has satisfied all the prongs necessary to succeed in its claim for injunctive relief. Accordingly, this Court should grant a permanent injunction be issued against Contextlogic, enjoining it from using Wish's registered trademark.[2]

### 3.   Wish is Entitled to a Judgment on its Federal Unfair Competition Claims.

To prevail on a claim for federal unfair competition under 15 U.S.C. § 1125(a), a movant must show (1) that the movant had enforceable trademark rights in the mark or name, and (2) that the respondent made unauthorized use of the mark or name such that consumers were likely to confuse the two. Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir.1997)); Crystal Entm't & Filmworks, Inc. v. Jurado, 643 F.3d 1313, 1320 (11th Cir.2011).

The "likelihood of confusion" analysis under 15 U.S.C. § 1125(a) is the same as that under 15 U.S.C. § 1114.  Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc., 833 F.2d 1484, 1488 (11th Cir.1987).  Accordingly, for the same reasons that Wish is entitled to prevail on its infringement claims, it is entitled to prevail on its Unfair Competition claims.

### 4.   Wish is Entitled to Judgment on its Attendant State Law and Common Law Claims.

The analysis applied to Wish's Federal Infringement claims is the same that should be employed on each of Wish's State Law claims as follows:

---

[2]        Wish concedes that such an injunction could only bar Defendant from selling the items covered by Wish's registration.  Defendant contends it sells everything "including the kitchen sink".  The injunctive relief sought herein would not bar Defendant from selling the "kitchen sink" using its "wish" mark – only from selling items covered by the Wish Mark.

i.      Count 4 – State Law Service Mark and Trade Name Dilution.

The Eleventh Circuit's analysis is applied to Georgia common-law infringement cases. See Ackerman Security Systems, Inc. v. Design Security Systems, 201 Ga.App. 805, 412 S.E.2d 588 (1991).

ii      Count 5 – Unfair Competition, Passing Off.

Courts may use analysis of Federal Infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition. Suntree Technologies, Inc. v. Ecosense Intern, Inc., 693 F.3d 1338, 1345 (11th Cir.2012).

ii.      Count 6 – Violation of Georgia Deceptive Trade Practices Act.

Georgia unfair-competition claims under O.C.G.A. § 23–2–5511 involve the same dispositive questions as trademark-infringement claims under the Lanham Act.   Caliber Automotive Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC, 605 F.3d 931, 935 n. 16. "Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition." Suntree, 693 F.3d at 1345 (quoting Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 n. 4 (11th Cir.2001)). Relief under O.C.G.A. § 23–2–55 "depends upon a showing of intent to deceive. However, this intent may be presumed if encroachment is done with knowledge of the prior right." Giant Mart Corp. v. Giant Disc. Foods, Inc., 247 Ga. 775, 279 S.E.2d 683, 685 (1981).  In this case, even if Contextlogic did not know if its infringement prior to the Cease and Desist letter being sent, it was aware of it thereafter and has continued to infringe.  Accordingly, Plaintiff is entitled to prevail on its Georgia Fair Business Practices Act.

**5.** **Wish has Been Damaged by Defendant's Infringement and an Award of Profits is Appropriate.**

Monetary recovery for violations of the Lanham Act, 15 U.S.C. § 1125(a), is provided for by 15 U.S.C. § 1117. Pursuant to Section 1117, Wish, assuming it is successful in its claims, may be entitled to recover: (1) Defendant's profits, (2) any damages sustained by Wish, and (3) costs of the action. The Court has wide discretion in assessing these damages, which may be awarded even when they are not susceptible to precise calculations. Ramada Inns, Inc. v. Gadsden Motel Company, 804 F.2d 1562, 1564–65 (11th Cir.1986).

Wish acknowledges that it is difficult to prove lost sales and devaluation in business. Wish can show that it has suffered damages from its employees fielding telephone calls as a result of source confusion when those employees could have been doing things that made Wish money rather than dealing with Defendant's angry customers.  However, as damages are difficult to show in a case such as the present one (as noted by the case law), Wish instead opts to recover Contextlogic's profits and is entitled to same as shown herein.

An award of an infringer's profits has traditionally been viewed under the Lanham Act and the common law of unfair competition as a way of compensating the plaintiff for sales lost to the infringer. As stated by one court in a case where, like here, the parties were direct competitors, "[t]he defendant's profits ... are a rough measure of the plaintiff's damages. Indeed, they are probably the best possible measure of damages available." Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 149 (4th Cir.1987). Additionally, awards of an infringer's profits have been recognized not merely as a surrogate for a plaintiff's actual lost sales, but as compensation for the defendant's unjust enrichment. As the Eleventh Circuit held in the leading case of Burger King Corp. v. Mason, 855 F.2d 779, 781 (11th Cir.1988):

> An accounting for profits has been determined by this Court to further the congressional purpose by making infringement unprofitable and is justified because it deprives the defendant of unjust enrichment and provides a deterrent to similar activity in the future.

Significantly, the Court in Burger King also held that an award of profits need not be based on a high showing of the infringer's culpability, but rather that such an award is appropriate against a defendant who is "purposely" infringing. 855 F.2d at 781. See also Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc., 833 F.2d 1484, 1488 (11th Cir.1987) (reversing a denial of profits and noting that a plaintiff need not prove actual damages in order to obtain an accounting of an infringer's profits).

In assessing the amount of an infringer's profits, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." See 15 U.S.C. § 1117(a).  The Lanham Act thus squarely places the burden of proof on the infringer to establish any deductions from its gross sales in order to arrive at the correct profit figure. Moreover, under the Lanham Act and the common law, it is the infringer's burden to prove any proportion of its total profits which may not have been due to the infringement. See J. Thomas McCarthy, Trademarks and Unfair Competition § 30:65 (4th ed.1998). See also Hamilton–Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 261, 36 S.Ct. 269, 272, 60 L.Ed. 629 (1916) (an infringer cannot take advantage of its own wrong; plaintiff carries its burden of proof when it shows the extent of defendant's total sales); Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 207, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942) ("There may well be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer."). Thus, "the plaintiff need only prove gross sales and then it is up to the infringer to prove which, if any, of those sales were not attributable to the wrongful act, and

deductible costs and expenses to arrive at net profits." J. Thomas McCarthy, Trademarks and Unfair Competition § 30:66 (4th ed.1998). Any doubts about the actual amount of gross sales or profits will be resolved against the infringing party.  Id. (citing Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 973 (2d Cir.1985)).

Regardless of its intent when it began using its Wish Mark, Defendant has clearly been purposefully and knowingly infringing on the Wish Mark since it received a Cease and Desist letter from counsel for Wish shortly after February 10, 2014.  While Defendant claims that it sells a broader range of products than Wish and some products that are not sold by Wish, the record is clear that Defendant sells clothing and shoes including streetwear and that of the 30 items pictured for sale on its website, all but 4 of such pictures featured apparel or footwear and the others featured a watch, bracelet, handbag and ear ring – all items sold by Wish. Approximately ▮▮▮▮▮▮▮▮ of the sales Defendant made a year-and-a-half prior to March of 2015 were fashion related and approximately half of sales of Defendant as of March of 2015 were fashion related.  With Defendant generating revenues of approximately ▮▮▮▮▮▮▮ in fiscal year 2014, a very large amount of money earned by Defendant has been earned selling fashion related items– which clearly makes Defendant a direct competitor of Wish.

Defendant was aware, as early as February 10, 2014 that Wish was receiving calls from confused customers and is aware that it provides no customer service number on its website. Defendant is also aware that it deals with ▮▮▮▮▮ disputes with customers and merchants per day.  CIT Group, a vendor has been confused by Defendant's Mark.  Wish has received 100 to 150 calls intended for Defendant.  Individuals have also visited the Wish store confused. Defendant knows of the confusion occurring in the market, and the anger that is being directed towards Wish by Defendant's customers, and the huge volume of disputes Defendant itself deals

with each day, yet it has continued its intentional and willful infringement and has done nothing to curtail the confusion of its customers with Wish.  Knowingly allowing this conduct to continue with full knowledge of the vast amount of complaints Defendant itself receives each day is clearly indicative of Defendant's intent in this case and disregard of Wish's valid Trademark.

The law does not provide that Wish must show that Defendant's profits were specifically derived from trading on Wish's goodwill; in this case, Defendant has used (and has continues to use) a mark that is the exact same ("Wish"), containing the exact same four letters and under which substantially similar goods are sold.  To the extent Defendant claims that not all of its profits are derived from competitive goods, Defendant will have the opportunity to present evidence of non-competitive items from which it has derived profits.

   6. <u>**Wish is Entitled to its Attorney's Fees**</u>.

The same willful conduct on the part of Defendant (i.e. continuing its blatant infringement after receipt of a cease and desist letter) entitles Wish to its attorney's fees under the Lanham Act and O.C.G.A. § 10-1-373.  The Lanham Act provides for such an award in "exceptional cases." 15 U.S.C. § 1117.  Intentional, deliberate or willful conduct is usually sufficient to make out an "exceptional case." <u>See</u>, <u>e.g.</u>, <u>Playboy Enterprises, Inc. v. P.K. Sorren Export Co.</u>, 546 F.Supp. 987, 999 (S.D.Fla.1982) (attorneys' fees awarded where infringement was deliberate); <u>Amana Soc. v. Gemeinde Brau, Inc.</u>, 417 F.Supp. 310 (N.D.Iowa 1976), affirmed, 557 F.2d 638, 639 (8th Cir.1977), cert. denied, 434 U.S. 967, 98 S.Ct. 511, 54 L.Ed.2d 454 (1977) (attorneys' fee award where defendant proceeded to use mark after being denied permission); <u>O'Brien Intern., Inc. v. Mitch</u>, 209 U.S.P.Q. 212, 217, 1980 WL 30251 (N.D.Cal.1980) (continuation of infringement after notice); <u>Hallmark Cards, Inc. v. Hallmark</u>

Dodge, Inc., 634 F.Supp. 990, 999 (W.D.Mo.1986) (deliberate and intentional infringement makes the case "exceptional").

In addition, some courts find bad faith sufficient to sustain an award of attorney's fees where the infringer continues to use a mark after the markholder's protest or refusal of permission. Hindu Incense, supra; Bowmar Instrument Corp v. Continental Microsystems, Inc., 497 F.Supp. 947 (S.D.N.Y.1980); Raufast S.A. v. Kicker's Pizzazz, Ltd., 208 U.S.P.Q. 699 (E.D.N.Y.1980).

As noted previously, Defendant has continued to infringe after receipt of a Cease and Desist Letter and has done so with full knowledge of the customer confusion that is occurring. Accordingly, Wish is entitled to its attorney's fees.


7.  **Wish is Entitled to Enhanced Damages and Punitive Damages.**

Wish seeks treble damages pursuant to 15 U.S.C. § 1117(a), which provides:

In assessing damages the court may enter judgment, according to the
circumstances of the case, for any sum above the amount found as actual
damages, not exceeding three times such amount. If the court shall find that the
amount of the recovery based on profits is either inadequate or excessive the court
may in its discretion enter judgment for such sum as the court shall find to be just,
according to the circumstances of the case. Such sum in either of the above
circumstances shall constitute compensation and not a penalty.

The Eleventh Circuit has noted that the damages provision in the Lanham Act "vests considerable discretion in the district court." Burger King Corp. v. Mason, 710 F.2d 1480, 1495 (11th Cir.1983). The court explained that, "[g]uided by the principles of equity, the court may award the defendant's profits. Additional extraordinary relief such as treble damages and attorney's fees are available under the statute if the district court believes that such an assessment would be just." Id. (emphasis in original). The Eleventh Circuit has also stated that an enhanced

damages award " 'is discretionary, but it may not be punitive, and must be based on a showing of actual harm.' " Optimum Techs., Inc. v. Home Depot U.S.A., Inc., 217 Fed.Appx. 899, 903 (11th Cir.2007) (quoting Babbit Electronics, Inc. v. Dynascan Corp., 38 F.3d 1161, 1183 (11th Cir.1994)).

In the present case, Wish has suffered actual harm by its employees having to field calls from angry customers of Defendant, with some of those customers refusing to believe that Wish was not Contextlogic.  In light of the intentional conduct outlined above, and the fact that the infringement has continued and still continues to this day, Wish is entitled to enhanced damages.

As far as punitive damages from a Georgia Law perspective, the continued infringement by Defendant after notice of same demonstrates "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences" as contemplated by O.C.G.A. § 51-12-5.1 such that punitive damages are appropriate in this case under Georgia law.

## CONCLUSION

Contextlogic has infringed on the Wish Mark.  There is not only a likelihood of consumer confusion – but actual consumer confusion.  The marks are the same and most of the products sold are the same.  The infringement continues and is intentional.  Accordingly, Wish is entitled to injunctive relief, Defendant's profits and its Attorney's fees.

Respectfully submitted this 7th day of October, 2015.

PAGE, SCRANTOM, SPROUSE,
TUCKER & FORD, P.C.

By:   /s/ Travis C. Hargrove
      Travis C. Hargrove
      State Bar No. 141374
      Attorneys for Plaintiff

1111 Bay Avenue, Third Floor
P.O. Box 1199
Columbus, Georgia  31901
(706) 324-0251
tch@psstf.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this day filed electronically via CM/ECF a true copy of the within and foregoing **TRIAL BRIEF** in the United States District Court for the Middle District of Georgia, with notice of same being electronically served by the CM/ECF system, addressed to the following:

Jeffrey C. Morgan
Barnes & Thornburg, LLP
Prominence in Buckhead
3475 Piedmont Rd. N.E., Suite 1700
Atlanta, GA 30305


Dwight D. Lueck
Barnes & Thornburg, LLP
11 South Meridian St.
Indianapolis, IN 46204

Robert C. Martin, Jr.
David Mize
Hatcher, Stubbs, Land, Hollis
& Rothschild, LLP
P.O. Box 2707
Columbus, GA 31901

This 7th day of October, 2015.

/s/ Travis C. Hargrove
Counsel for Plaintiff