IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

WISH ATLANTA, LLC,                    *

    Plaintiff,                        *

vs.                                   *

                                  CASE NO. 4:14-CV-51 (CDL)

CONTEXTLOGIC, INC.,                   *

    Defendant.                        *

_____

O R D E R

    Wish Atlanta, LLC sued Contextlogic, Inc. for federal and common law trademark infringement and related state law claims. The Court conducted a bench trial on these claims.  Based on the following findings of fact and conclusions of law, the Court finds that Wish Atlanta has not carried its burden of establishing any of its claims and that Contextlogic is entitled to judgment in its favor.

FINDINGS OF FACT

1.

    Wish Atlanta is a Georgia corporation with its principal place of business in Atlanta, Georgia.  Compl. ¶ 1, ECF No. 1.

2.

    Wish Atlanta is an upscale boutique located in a restored historic Carnegie library in Atlanta, Georgia.  It specializes

in high-end "street wear" clothing and accessories.   Trial Tr. vol. 1, 14:10-14; 17:7-19; 24:4-25:9, ECF No. 78.

3.

"Street wear" is a broad term that includes apparel influenced by hip-hop culture.  *Id.* at 59:20-24.   For Wish Atlanta's targeted market—the upscale, image-conscious consumer with substantial disposable income and an oversized fashion budget—that street wear includes $200 jeans, $650 Nike sneakers, and $300 ball caps.  *See id.* at 24:8-25:16 (describing the high-end, exclusive nature of the "street wear" sold at Wish Atlanta).

4.

Wish Atlanta sells hard to find, limited-edition items from manufacturers such as Nike® that are sold at only a handful of stores in the United States.  *Id.* at 24:4-22.

5.

Wish Atlanta is highly selective in its offerings and does not offer goods that could be purchased at a mall.   *Id.* at 24:18-22; 25:4-16.

6.

The target market for Wish Atlanta is African-American males in Atlanta.  *Id.* at 27:1-7, 112:4-5.

7.

Wish Atlanta uses the following design mark (the "Wish Atlanta Design Mark") in connection with its retail store:

**wish**® Combined Decl. of Use and Incontestability 4-6, Ex. P-19, ECF No. 76-1.

8.

Wish Atlanta has used the Wish Atlanta Design Mark in connection with a website, www.wishatl.com, since 2010. Trial Tr. vol. 1, 21:25-22:9; Wish Atlanta Website Printout, Ex. D-77, ECF No. 77-1. That website offers some of the goods that are offered through Wish Atlanta's retail store. Trial Tr. vol. 1, 74:21-75:10.

9.

Not all of the goods shown on the Wish Atlanta website can be purchased through the website. Some are only available in the brick-and-mortar store. *Id.* at 74:21-75:5. Wish Atlanta uses the website as a marketing tool to drive business to its brick-and-mortar store. *Id.* at 78:2-3.

10.

84% of Wish Atlanta's sales in 2014 were sales made through its brick-and-mortar store. *Id.* at 77:16-78:2; Wish Atlanta Profit and Loss Sheets, Exs. D-41, D-42, D-43, D-44, D-52.

Sales through the www.wishatl.com website have never constituted more than 16% of sales in any year since the website went live.

11.

Wish Atlanta had an opportunity to purchase the wish.com domain name at the time it purchased the www.wishatl.com domain name, but did not do so.  Trial Tr. vol. 1, 47:7-12.

12.

Wish Atlanta introduced no evidence of the amount of sales made outside of the Atlanta metropolitan area.

13.

Wish Atlanta holds two federal registrations for the Wish Atlanta Design Mark.  It holds U.S. Reg. No. 3,783,165 for use of the design mark in connection with a variety of apparel, and for use of the mark in connection with retail store services featuring clothing and accessories, footwear, handbags, eyewear, and other items.  Trademark Record Ex. P-3.  It also holds U.S. Reg. No. 4,242,361 for use of the design mark in connection with online retail store services featuring clothing, clothing accessories, fashion accessories, footwear, handbags, and other items.  Trademark Record, Ex. P-2.

14.

In its description of the Wish Atlanta Design Mark, Wish Atlanta notes as a component of its mark that "the 'i' is offset

4

to the right and slightly over the left side of the 's' to form the image of a person."  *Id.* at 2.

15.

Wish Atlanta views this component of the Wish Atlanta Design Mark as being so important that it has obtained two trademark registrations for this "reclining man" component of its design mark:



Trademark Record, Ex. D-76.

16.

Wish Atlanta also features the "reclining man" component of the Wish Atlanta Design Mark on its website.  Wish Atlanta Website Printout, Ex. D-77.

17.

Wish Atlanta depicts its Wish Atlanta Design Mark in black. Trial Tr. vol. 2, 13:8-14:6, ECF No. 79.

18.

Wish Atlanta alleges rights in the word mark "WISH" apart from the design depicted above.  Trial Tr. vol. 1, 40:23-41:3.

19.

In support of this claim, Wish Atlanta presented the expert testimony of Dr. Thomas J. Maronick.  Dr. Maronick conducted a survey of African-American males over the age of eighteen in the

Atlanta market that were familiar with "street wear." An Empirical Analysis of Perceptions of "Wish" Among Buyers of "Street Wear" ("Maronick Study"), Ex. P-18, at 4. Of the 165 participants, the majority, 69.1%, either did not associate the word "wish" with any particular store or retailer, or did not know whether they associated the word with a particular store or retailer. *Id.* at 8. Only six of the 46 participants who associated "wish" with a particular store or retailer (3.6% of the total 165 participants) identified Wish Atlanta as the store they associated with the word "wish." *Id.*; Trial Tr. vol. 1, 194:20-195:1.

20.

Wish Atlanta produced no evidence as to any association between the word mark "wish" and Wish Atlanta outside of the target market surveyed by Dr. Maronick.

21.

The only documentary evidence that Wish Atlanta uses the word "wish" without incorporating that word into its design mark is one screen from its website that shows the word "wish" as well as the Wish Atlanta Design Mark and the "reclining man" mark on the same web page. Wish Atlanta Website Printout, Ex. D-77.

22.

Wish Atlanta places a modest balance sheet value on its trademark.  Wish Atlanta Balance Sheet as of Mar. 31, 2015, Ex. D-64.

23.

Wish Atlanta's records show that it has spent a total of $214 advertising its website since that website went live.  Wish Atlanta Advertising Expenditures by Year, Ex. D-84.

24.

Wish Atlanta produced evidence at trial that it has been mentioned in the media.  Trial Tr. vol. 1, 17:20–18:22.

25.

Representatives of Wish Atlanta testified that they were aware of two other entities that had offered or were offering clothing under a name that included the word "wish."  Trial Tr. vol. 1, 63:17–65:1; 105:9-16; 114:3-12.  Wish Atlanta has made no effort to stop either of these entities from continuing to use the word "wish" in their names.  *Id.* at 65:4-6; 114:9-12.

26.

In addition, several entities throughout the United States sell clothing and accessories over websites using the mark "Wish," including entities located in Massachusetts, Wish Boutique Beacon Hill "About Wish," Ex. D-18; Wish Boutique Beacon Hill Website Photo, D-19; Wish Boutique Beacon Hill Yelp

Page, D-20, North Carolina, Wish Boutique Facebook Page, Ex. D-33; Wish Boutique "Welcome to Wish," Ex D-34, South Carolina, Wish Boutique Yelp Page, Ex. D-21; Wish Boutique "About us," Ex. D-36; Wish FivePoints Facebook Page, Ex. D-37; Wish Boutique Products, Ex. D-38, New Jersey, Wish Boutique NJ Facebook Page, Ex. D-22; Wish "In Wish's Words," Ex. D-28, Colorado, "About Wish Boutique," Ex. D-23; Wish Boutique Facebook Page, Ex. D-24; "Welcome," Ex. D-25, Texas, Wish Yelp Page, Ex. D-26, California, Ai Wish, Ex. D-27, New York, Wish Inc. Facebook Page, Ex. D-32, Wisconsin, Wish Boutique Wisconsin, Ex. D-39, and Louisiana, Wish Boutique French Quarter Facebook Page, Ex. D-29; Wish Yahoo Page, Ex. D-30; Wish Yelp Page, Ex. D-31.

27.

Several of these websites include a design component in connection with their use of the mark "Wish," including:





Ex. D-28          Ex. D-27          Ex. D-32





Ex. D-36          Ex. D-33          Ex. D-24

          

Ex. D-26                 Ex. D-39                 Ex. D-18

28.

Dr. Maronick found that survey participants who associated the word "wish" with particular stores or websites associated the word "wish" with a number of different entities, including entities that Dr. Maronick found in a simple internet search he conducted, and fictional entities that he made up for his study. Trial Tr. vol. 1, 195:5-21; Maronick Study, Ex. P-18, at 8-9.

29.

Defendant Contextlogic is a Delaware corporation with its principal place of business in San Francisco, California. Trademark Registration, Ex. D-3.

30.

Contextlogic was founded in 2010 by Peter Szulczewski, a former Google employee, and Danny Zhang.  Trial Tr. vol. 1, 209:8-9; 323:23-324:1; Trial Tr. vol. 2, 6:7-14.

31.

Contextlogic was founded to use inference technology to anticipate what goods users of a mobile application ("app") or

an internet website might be interested in purchasing.   Trial
Tr. vol. 1, 246:25-248:20; 286:2-19.

32.

Contextlogic began by operating a website located at
www.wishwall.me.   Initially that website allowed users to
compile a "wish list" of goods that he or she could share with
others.  *Id.* at 287:11-21; 288:19-290:3; Wish Website Archive,
Ex. D-11, at 1-4.

33.

That website operated under the mark "Wish."   Trial Tr.
vol. 1, 321:7-18; Wish Website Archive 1, Ex. D-11, at 1.

34.

In October 2012, Contextlogic acquired the domain name
www.wish.com.   It has since operated its website at the
www.wish.com address (the "Wish Website").   Trial Tr. vol. 1,
290:8-10.

35.

It spent $500,000 to purchase the www.wish.com domain name.
*Id.* at 290:11-14.

36.

Contextlogic has obtained two registered trademarks, Reg.
Nos. 4,311,924 and 4,340,974, for the mark WISH for use in
connection with the wish list and gift registry services that it
offers through its app and its website.    *Id.* at 223:13-15;

10

Trademark Registration, Ex. D-3; Trademark Registration, Ex. D-9.

37.

In June 2012, Contextlogic began offering an app that could be downloaded onto a user's cell phone under the mark WISH (the "Wish App").  Trial Tr. vol. 1, 292:21-293:1.  The Wish App is free to download.  *Id.*

38.

Contextlogic's Wish app and Wish website also allow users to purchase goods from featured vendors.  *Id.* at 290:25-292:10. The Wish App and Wish website function as a virtual shopping mall, allowing users to purchase home décor, clothing, hunting bows, kitchen sinks, and other goods.  *Id.* at 207:11-25; 208:14-25.

39.

The Wish App and Wish website identify the merchant of the product the user is considering purchasing.  *Id.* at 307:11-14.

40.

Contextlogic does not offer products that are branded WISH. *Id.* at 212:13-19.

41.

Contextlogic does not typically take ownership of the products being offered through its website and app.  Rather, it serves as a facilitator, receiving a commission for facilitating

11

the transaction between the Wish App or Wish Website user and the merchant.  *Id.* at 208:1-10; 209:12-18.  This is the only way that Contextlogic presently earns income.  *Id.* at 225:9-228:19.

42.

The Wish App is identified by this logo:



*Id.* at 296:19-297:5; Video Ex. D-81.

43.

The stylized "W" is meant to suggest a shopping cart. Trial Tr. vol. 1, 297:6-14.

44.

The Wish App also uses the mark WISH with the phrase "Shopping Made Fun" in the following design:



*Id.* at 298:13-21; Video Ex. D-81.

45.

Contextlogic depicts its WISH mark in blue, or in white against a blue background.  Trial Tr. vol. 1, 297:16-18; Video, Ex. D-81.

46.

Over 155 million users have downloaded the Wish App since it was first offered.  Trial Tr. vol. 1, 293:17-20.

47.

The Wish App became more popular than the Wish Website soon after the Wish App was first offered in 2012.  Currently 90% or more of the transactions facilitated by Contextlogic are conducted through the Wish App rather than through the Wish Website.   *Id.* at 202:1-3.   Contextlogic has not promoted consumer use of the Wish Website since it launched the Wish App. *Id.* at 216:1-10.

48.

Only about 35% of sales made through the Wish App are sales made to users located in the United States.   *Id.* at 221:5-7; 295:3-7.

49.

The Wish App and the Wish Website are targeted primarily at women.  Women place 66-67% of the transactions in the Wish App and the Wish Website.  *Id.* at 295:3-7.

50.

As of October 2015, Contextlogic offered millions of items through its Wish App, offered by tens of thousands of different vendors.  *Id.* at 207:20-25.

51.

Contextlogic offers a wide variety of products through its Wish App.  Currently, the majority of those products are items other than clothing and accessories.  *Id.* at 202:17-22.

52.

Most of the products offered through the Wish App do not carry a brand name.  *Id.* at 212:13-213:3.

53.

Contextlogic's focus is on the value-conscious consumer. *Id.*  The average price of a transaction made through the Wish App is less than twenty-five dollars.  *Id.* at 248:16-17.

54.

When a search for "street wear" was conducted on the Wish App using the search functions contained in the app, only thirty-five of the millions of items available through the Wish App were identified as "street wear."  *Id.* at 293:21-294:14.

55.

Both the Wish App and the Wish Website offer users the ability to contact Contextlogic through email or through the app

directly with questions or complaints about orders. *Id.* at 231:14-21; 313:12-314:8; 316:2-12; 319:5-10.

56.

As of October 2015, Contextlogic was responding to most of these communications within two hours after their receipt. *Id.* at 233:12-16; Trial Tr. vol. 2, 9:12-10:5.

57.

Contextlogic does not provide a toll free number to its users. Trial Tr. vol. 1, 223:10-12. It experimented with a toll free number for several months but found that customers preferred communicating through the app or email. *Id.* at 230:24-232:2; Trial Tr. vol. 2, 8:11-9:4.

58.

Contextlogic spends significant amounts of money on mobile install ads and on Facebook advertising. Trial Tr. vol. 1, 320:3-7.

59.

To date, Contextlogic has not made a profit on the Wish App or Wish Website. *Id.* at 217:4-5.

60.

In November 2013, Wish Atlanta noticed that it began receiving occasional telephone calls from customers who did not appear to be calling for Wish Atlanta. *Id.* at 148:5-12.

61.

Wish Atlanta typically receives a total of twenty-five to fifty telephone calls each day.  *Id.* at 148:1-4.

62.

At trial, Wish Atlanta asserted that it had received dozens of calls from disgruntled Contextlogic consumers that were trying to reach Contextlogic.  *Id.* at 122:17-21; 150:11-12; 152:3-8.  Wish Atlanta employees were instructed to keep call logs of every misdirected call.  *Id.* at 97:21-24; 102:6-16.  But those logs identify only fifty misdirected phone calls received by Wish Atlanta between February 2014 and March 2015.  Wish App Phone Calls, Ex. P-5; Wish Complaint Log, Ex. P-6; Wish Complaint Log, Ex. P-7.

63.

According to the call logs, the calls from Contextlogic customers reaching Wish Atlanta became less frequent after the 2013-2014 holiday season.  For example, Wish Atlanta's call logs identify only five inadvertent calls in March 2015.  Wish Complaint Log, Ex. P-7.

64.

There is no evidence of any misdirected calls reaching Wish Atlanta after March 2015.

65.

At trial, Wish Atlanta introduced the testimony of one of the callers who inadvertently reached Wish Atlanta.  The witness testified that she had placed several orders through Contextlogic's Wish App.  Trial Tr. vol. 1, 257:19-258:1.  She wanted to contact Contextlogic by telephone concerning an order, so she conducted an internet search to find Contextlogic's telephone number.  *Id.* at 258:13-21.  In conducting that internet search, she found the phone number for Wish Atlanta and called that number.  *Id.*  She did not look at Wish Atlanta's website before calling its telephone number.  *Id.* at 261:15-21.  She was not aware of Wish Atlanta or its trademark before she placed her call.  *Id.* at 264:8-265:5.

66.

Wish Atlanta also introduced a chain of emails that began with an email from a Wish App user to Contextlogic.  After some exchange between the user and Contextlogic's help desk, the user added as a courtesy-copy recipient two email addresses ending in wishatl.com.  Customer Emails, Ex. D-82, at 1.  There was no evidence as to why the user did so.

67.

Aside from this email chain, Contextlogic has not received any communications meant for Wish Atlanta or copying Wish Atlanta, nor has it received any communications asking whether

17

there is an affiliation between Wish Atlanta and Contextlogic. Trial Tr. vol. 1, 320:11-22; Trial Tr. vol. 2, 21:22-22:23.

68.

The evidence does not support a finding that the callers were calling about merchandise that was substantially similar to the merchandise sold by Wish Atlanta. The callers simply located Wish Atlanta's telephone number, likely through a sloppy internet search, and mistakenly concluded that the telephone number was for Contextlogic. No evidence was introduced indicating that these callers intended to purchase merchandise from Wish Atlanta and instead mistakenly purchased merchandise through Contextlogic's Wish App. The evidence suggests only that consumers knew that they had purchased merchandise through the Wish App, but they mistakenly reached Wish Atlanta in their inquiries about their orders.

69.

Prompted by the telephone calls mentioned above, counsel for Wish Atlanta sent a cease and desist letter to Contextlogic on February 10, 2014. Letter from Jerry L. Watts, to Peter Szulczewski (Feb. 10, 2014), Ex. P-1. Wish Atlanta demanded, among other things, that Contextlogic cease and desist from any use of the mark WISH, and that it turn over to Wish Atlanta the domain name www.wish.com. *Id.* at 2.

70.

Contextlogic did not agree to these demands.   Trial Tr. vol. 1, 230:12-23.

71.

Contextlogic was not aware of Wish Atlanta or the Wish Atlanta Design Mark before receiving this cease and desist letter.   *Id.* at 320:8-10.   Contextlogic researched the WISH trademark before initially adopting its own WISH mark but did not find Wish Atlanta or its trademark registrations.   *Id.* at 323:7-22.

72.

There is no evidence that any item offered by Wish Atlanta has ever been available through the Wish App or the website www.wish.com.   *Id.* at 140:6-9; 294:20-295:2.

73.

There is no evidence that anyone familiar with Wish Atlanta has ever downloaded the Wish App or done business with Contextlogic because that user believed he or she was dealing with Wish Atlanta.   *Id.* at 143:11-144:10.

74.

Wish Atlanta cannot identify any sales that it has lost as a result of Contextlogic's use of its WISH mark.   *Id.* at 87:17-21.

75.

Wish Atlanta cannot identify any sales that Contextlogic made as a result of trading on the goodwill that Wish Atlanta may have in the Wish Atlanta Design Mark or the word mark WISH. *Id.* at 87:22-88:2.

76.

To the contrary, both Wish Atlanta's brick-and-mortar store and internet store sales have increased since Contextlogic began offering its Wish App.  Wish Atlanta Gross Income by Year, Ex. D-83.

CONCLUSIONS OF LAW

**I.   Trademark Infringement and Unfair Competition**

1.

Wish Atlanta brings claims for infringement of a registered mark, common law trademark infringement under Section 43(a) of the Lanham Act, and state law claims for unfair competition and deceptive trade practices.  To prevail on any of these claims, Wish Atlanta must prove that Contextlogic created a likelihood of confusion among potential buyers by adopting and using its own WISH trademark.  *See Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 934 (11th Cir. 2010) (setting forth the elements of infringement of a registered trademark); *Tana v. Dantanna's LLC*, 611 F.3d 767, 773 (11th Cir. 2010) (stating the elements of common law trademark

infringement under Section 43(a) of the Lanham Act); *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1539 n.11 (11th Cir. 1985) (explaining that the elements for Georgia's unfair competition and Deceptive Trade Practices Act are the same as those under the Lanham Act).

2.

The evidence is undisputed that Contextlogic has not acted with the authorization of Wish Atlanta.  Thus, the fundamental question is whether Contextlogic's use of its WISH trademark is likely to cause "confusion in the mind[s] of an appreciable number of reasonably prudent buyers." *John H. Harland Co., v. Clarke Checks, Inc.*, 711 F.2d 966, 979 n. 22 (11th Cir. 1983) (alteration in original) (quoting J.T. McCarthy, Trademarks & Unfair Competition § 23:27, at 87-88 (1973)).

3.

The Eleventh Circuit has identified the following factors for courts to consider in evaluating whether a likelihood of confusion exists:

> In evaluating whether there is a likelihood of confusion between two marks, our court applies a multifactor test, evaluating the following seven factors: (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the

21

proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Tana*, 611 F.3d at 774-775; *accord Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1514 (11th Cir. 1984).

4.

Application of these factors to the present case clearly demonstrates that Wish Atlanta has failed to establish that Contextlogic's use of its own WISH trademarks has created a likelihood of confusion with Wish Atlanta's marks. As a result, Wish Atlanta's trademark and unfair competition claims fail.

A.  Strength of the Mark

5.

The first element considered in a likelihood of confusion analysis is the strength of the mark being asserted by the plaintiff. To determine the strength of the mark, the Court looks to the following sliding scale of distinctiveness. The types of marks are listed in ascending order of strength: (1) generic, (2) merely descriptive, (3) suggestive, and (4) arbitrary. *Tana*, 611 F.3d at 774. Suggestive and arbitrary marks are deemed "inherently distinctive." *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 783 (1992)). Generic marks are deemed incapable of receiving trademark protection. *Id.* Descriptive marks, though not inherently

22

distinctive, may become sufficiently distinctive to enjoy trademark protection by acquiring "secondary meaning." *Id.*

6.

Wish Atlanta asserts both registered trademark rights in its Wish Atlanta Design Mark **wish**, as well as common law rights in the word WISH, regardless of how that word might be depicted, for use in connection with retail store services featuring clothing and accessories. Wish Atlanta had the burden of proving that it has common law trademark rights in the word mark WISH, and the geographic scope of those common law rights. *Id.* at 780 (considering the geographic remoteness of the mark's use to determine the likelihood of confusion). Because Wish Atlanta's burden differs between its claims based on the registered Wish Atlanta Design Mark and its common law claim to the word mark WISH, the Court will assess the strength of the marks separately.

7.

The Court concludes that the word mark WISH, when used in connection with the sale of clothing and apparel, is extremely weak and is "merely descriptive" at best.

8.

Third party use of a mark is important in considering the strength of the mark. The more third parties that use the mark for the same or related goods or services, the weaker the mark.

*See Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir. 1981) (finding "the extensive third-party use of the word 'sun' impressive evidence that there would be no likelihood of confusion"); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 505 (5th Cir. 1979) (finding that numerous third-party uses of the word 'world' militates against the finding of likelihood of confusion).

9.

The evidence establishes that a number of different entities located across the United States use the mark WISH in connection with clothing boutiques. Therefore, the word "wish" standing alone is merely descriptive. *See Giant Mart Corp. v. Giant Disc. Foods, Inc.*, 247 Ga. 775, 777, 279 S.E.2d 683, 686 (1981) (concluding that a trial court erred in affording protection to the trade name "Giant" because the word "is a descriptive term commonly used in the grocery business" that "may not be exclusively appropriated as part of a trade name.").

10.

Wish Atlanta's survey expert confirmed the extremely weak nature of the WISH word mark. In his survey, only 3.65% of Wish Atlanta's target market—African-American males over the age of eighteen residing in the Atlanta metropolitan area and familiar with "street wear"—associated the word "WISH" with Wish Atlanta.

24

11.

"[W]here a plaintiff holds only common-law trademark rights in a mark . . . it is well-established that the scope of protection accorded his mark is coextensive only with the territory throughout which it is known and from which it has drawn its trade." *Tana*, 611 F.3d at 780.  In *Tana*, for example, the court concluded that the plaintiff's rights in its common law mark were weak outside of Los Angeles, where the plaintiff operated a restaurant under the contested trademark.  *Id.* at 776.

12.

The evidence establishes that to the extent Wish Atlanta has any rights in the word mark WISH, those rights are confined to the sale of upscale street wear in the Atlanta metropolitan area.  Over 80% of Wish Atlanta's sales take place through its retail store located in Atlanta.  Although Wish Atlanta maintains a website, sales through the website are modest, and there is no evidence that any of those sales were made to customers outside of the Atlanta metropolitan area.  Moreover, Wish Atlanta CFO Pam Sutter testified that the website is used as a marketing tool to drive traffic to Wish Atlanta's brick-and-mortar store.

13.

Thus, any trademark rights that Wish Atlanta holds in the word mark WISH are extremely weak and are confined to the sale of upscale street wear in the Atlanta metropolitan area.

14.

Regarding the registered design mark for Wish Atlanta, the word component of the mark is extremely weak for all of the reasons described above.  In addition, Wish Atlanta cannot claim broad protection for the design component of the mark because there are numerous registrations and common law uses of design marks used in connection with the sale of clothing and apparel that incorporate the word "wish" into their designs:



Ex. D-28



Ex. D-27



Ex. D-32



Ex. D-26



Ex. D-77



Ex. D-36



Ex. D-24



Ex. D-39



Ex. D-33

15.

In light of these many other designs, consumers must pay attention to the specific design component of the mark, rather than assume that any design incorporating the word "wish" emanates from a particular source.   Thus, to the extent that Wish Atlanta asserts trademark rights based on its design mark, those rights are extremely weak outside of the very specific design that its registered trademark protects.

16.

In summary, both the WISH word mark and the Wish Atlanta Design Mark are extremely weak and merit only narrow protection. Because the marks are weak, reasonably prudent buyers would not assume that goods came from or were associated with Wish Atlanta when those consumers encountered goods or services offered under another entity's WISH mark.

B.   Similarity of the Infringed and Infringing Marks

17.

In considering the similarity of the marks, "the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used."   *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1337 (11th Cir. 1999).   The evidence presented at trial failed to establish that the marks in this dispute are substantially similar.

27

18.

The Wish Atlanta Design Mark is typically rendered in black.   The mark has a very specific form.   Wish Atlanta carefully defined the design to the United States Patent and Trademark Office as "the letters 'w,' 'i,' 's,' and 'h,' where the dot from the 'i' is offset to the right and slightly over the left side of the 's' to form the image of a person." Trademark Record, Ex. P-2, at 2.   Wish Atlanta places so much importance on this offset dot over the "s" component of its mark that it obtained a registered trademark for that design component alone.   Trademark Record, Ex. D-76.   It also uses that design component standing alone on its website.

19.

By contrast, Contextlogic's use of a "wish" related mark is almost always used in connection with its own design, rendered in blue, or in white against a blue background:



Video, Ex. D-81.

20.

Contextlogic's design does not "form the image of a person," as Wish Atlanta's does.   Rather, the focus is on the "w," with the handle on the "w" meant to conjure up images of a shopping cart.   Contextlogic placed so much emphasis on this

28

stylized "w" that it uses that stylized letter alone in the icon promoting the Wish App.

21.

Additionally, as discussed above, the Court notes that there are several entities using WISH design marks for goods and services similar to those offered by Wish Atlanta that have design elements similar to the design elements of the Wish Atlanta Design Mark in their own designs.

22.

In summary, Contextlogic's mark is not confusingly similar to the Wish Atlanta Design Mark.  The different presentations of the mark WISH by the parties reduce any likelihood of confusion. Therefore, this element of the likelihood of confusion analysis tips in Contextlogic's favor.

C.   Similarity Between the Goods and Services Offered Under the Two Marks

23.

Wish Atlanta uses its marks in connection with the sale of high-end "street wear" clothing and accessories.  Wish Atlanta's owner, Lauren Amos, testified that Wish Atlanta sells limited-edition items that are sold at only a few stores in the nation. The items sold by Wish Atlanta cannot be found at a typical mall.  They include extremely expensive and hard-to-find baseball caps and designer shoes.

24.

Contextlogic, by contrast, facilitates the sale of goods offered by various vendors. The Wish App allows users to purchase everything from fishing equipment to electronics. Most of the goods sold through Contextlogic's Wish App are not clothing or apparel. Moreover, the great majority of the goods sold through the Wish App are not branded and are inexpensive.

25.

There is no evidence that Contextlogic has offered a single item of clothing through the Wish Website or the Wish App that was also available from Wish Atlanta. In fact, the evidence suggests that the high-end goods that Wish Atlanta is known for *could not* be purchased on Contextlogic's Wish App or Wish Website. Thus, although both parties sell clothing under their respective WISH marks, Contextlogic does not sell the same goods that Wish Atlanta sells.

26.

The parties also offer different services. Wish Atlanta functions as a traditional retail store. Contextlogic is a facilitator of sales between merchants and customers. In this sense, Contextlogic's Wish App functions as a virtual shopping mall, allowing users to see and purchase products from a wide variety of merchants, all of whom are identified on the Wish App.

27.

In addition, the Wish App allows users to compile wish
lists of product that can be shared with other users of the Wish
App.  This aspect of Contextlogic's app was so important to
Contextlogic that it obtained two trademark registrations for
the word mark WISH for use in connection with these services.
Wish Atlanta offers no comparable service.

28.

The Wish App also allows users to rate products and
merchants.  Trial Tr. vol. 1, 210:25-211:14; 306:23-307:10.
Wish Atlanta offers no similar services.

29.

The different services offered by the parties (wish lists
and product ratings versus traditional retail services), and the
differences in the products offered under the marks, minimizes
any likelihood of confusion between Wish Atlanta and
Contextlogic.

30.

Thus, this factor favors Contextlogic.

D.   Similarity of the Actual Sales Methods Used by the Parties

31.

The Court next looks to the similarity between the sales methods and customers of Wish Atlanta and Contextlogic.

32.

As alluded to previously, the parties use different methods to sell their goods and services. Over 80% of Wish Atlanta's sales are made through a brick-and-mortar store located in Atlanta. Less than 20% of its sales are made through its website, www.wishatl.com. Moreover, that website is primarily used as a device to promote Wish Atlanta's brick-and-mortar store.

33.

Wish Atlanta has no app that may be loaded onto a prospective consumer's cell phone.

34.

Wish Atlanta functions as a traditional retailer, buying clothing and accessories that it then sells to customers through its brick-and-mortar store and website.

35.

Contextlogic, by contrast, has no brick-and-mortar store. The vast majority of its sales are made through the Wish App.

Only approximately 10% of its sales are made through its website, www.wish.com.

36.

Contextlogic does not own the products offered through its Wish App.  Rather, it is like an electronic shopping mall, offering users the ability to peruse the stores of thousands of different vendors.  In the process, Contextlogic identifies the merchant who is selling the good.

37.

Contextlogic's target market is primarily women, whereas Wish Atlanta's is men.  Moreover, only 35% of the sales brokered through the Wish App are made to users located in the United States.

38.

In summary, this factor weighs strongly against any likelihood of confusion being created by Contextlogic's use of its WISH mark in connection with its services.

E.   Similarity of Advertising Methods

39.

Wish Atlanta and Contextlogic have very different methods of advertising.  Wish Atlanta has spent nominal amounts of money on stickers, buttons, and promoting its products on social media.  Wish Atlanta primarily promotes itself through media

33

attention and celebrity appearances at the brick-and-mortar store.

40.

Contextlogic, by contrast, has invested significant resources in advertising and promoting its Wish App. It advertises primarily through the internet, on websites like Facebook®.

41.

These differences in advertising and promotional efforts indicate little likelihood of confusion.

F.   Intent of Contextlogic

42.

Wish Atlanta failed to establish that Contextlogic had any intention to trade on any goodwill that Wish Atlanta may have in its marks when Contextlogic adopted and began use of its WISH mark. Contextlogic was not even aware of Wish Atlanta or Wish Atlanta's marks before it received a cease and desist letter from Wish Atlanta's counsel.

43.

There is no evidence that Contextlogic intended to trade on any goodwill that Wish Atlanta may have in its mark after receiving the cease and desist letter.

34

44.

Contextlogic had constructive knowledge of the Wish Atlanta Design Mark, the mark in which Wish Atlanta has registrations, by virtue of the registration of that mark. But "the existence of constructive notice is not evidence that a later user necessarily intended to confuse." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 23:109 (4th ed. 1996).

45.

In sum, the intent factor weighs in favor of Contextlogic.

G.   Evidence of Actual Confusion

46.

At trial, Wish Atlanta emphasized that its primary concern was the possibility that people already familiar with Wish Atlanta may encounter Contextlogic's website or Wish App and be confused as to whether they were dealing with Wish Atlanta. Trial Tr. vol. 1, 50:13–51:21.  But Wish Atlanta introduced no credible evidence indicating that anyone familiar with Wish Atlanta has ever intended to purchase a product from Wish Atlanta but mistakenly purchased a product from Contextlogic's Wish App instead. *See id.* 142:20–144:10.

47.

Wish Atlanta alleges actual confusion based on telephone calls it received that were meant for Contextlogic.

48.

Wish Atlanta had the burden of establishing that this evidence constitutes evidence of "actual confusion" rather than inattentiveness on the part of the caller.

49.

Wish Atlanta attempted to introduce evidence of confusion through customer call logs. The Court considers the logs as evidence that the identified calls were received, and the identity of the party making those calls. The Court does not consider the logs as evidence of the reasons for the calls. The alleged reasons for the calls recorded on these logs are excluded as hearsay because they reflect the subjective assessment of Wish Atlanta employees, not the statements of the callers. Thus, the logs are inadmissible as records of what the callers allegedly stated.

50.

Wish Atlanta also presented testimony of two former employees who received many of the misdirected calls. Contextlogic objected to this evidence at trial as hearsay. The Court accepts this challenged evidence under Federal Rule of Evidence 803(3) as evidence of receipt of telephone calls from callers seeking an entity other than Wish Atlanta, but declines to consider it for the substance of what the callers allegedly said. *See Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*,

522 F.3d 1200, 1206 (11th Cir. 2008) (noting that the district court's consideration of the substance of what the out-of-court "confused" donors said was a classic violation of Federal Rule of Evidence 801(c)).

51.

In addition, the Court discounts this evidence because of its imprecision.   Wish Atlanta employees testified that they were instructed to log every misdirected call.   Although the employees testified to dozens of allegedly misdirected calls, the logs reflected only fifty misdirected calls.

52.

One of the callers identified in Wish Atlanta's call logs testified that she had not heard of Wish Atlanta at the time that she bought goods through the Wish App.   When she decided that she wanted to cancel her order, she conducted an internet search for a telephone number for Contextlogic.   She found the telephone number for Wish Atlanta in that search and called Wish Atlanta by mistake.

53.

This evidence does not constitute "actual confusion" for a likelihood of confusion analysis.   Mere inadvertence on the part of the person making a phone call does not constitute actual confusion.   *See., e.g., Duluth News-Tribune, a Div. of Nw. Publ'ns, Inc. v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir.

1996) (finding that "vague evidence of misdirected phone calls and mail . . . show[s] inattentiveness on the part of the caller or sender rather than actual confusion."). Nor do misdirected communications prompted by a sloppy or incomplete internet search constitute actual confusion. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002) (discounting misdirected email communications as evidence that the consumers were "inattentive or careless, as opposed to being actually confused"). The evidence simply shows that the confused callers were likely "inattentive or careless when attempting to find the [phone number] for [Contextlogic], rather than confused about the source of the [products they had purchased]." *Id.*

54.

In this case, the witness's telephone call to Wish Atlanta was prompted by a sloppy internet search, exacerbated by the fact that the witness had never heard of Wish Atlanta. The witness had not confused the two parties.

55.

The Court also notes that the bulk of allegedly misdirected telephone calls took place in November and December 2013. During that time, Contextlogic was in the early stages of developing its customer service network. Trial Tr. vol. 2, 9:25–10:25. The misdirected calls dwindled after Contextlogic developed a more robust customer service network. *See* Wish

38

Atlanta Complaint Log, Ex. P-7.  In light of these facts, the Court concludes that the misdirected calls were a result of inattentiveness or carelessness on the part of the callers, not trademark infringement.

56.

In addition, the type of alleged confusion is relevant in determining whether "actual confusion" exists.  "Short lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight while confusion of actual customers of a business is worthy of substantial weight." *Caliber Auto. Liquidators, Inc.*, 605 F.3d at 936.  The evidence establishes that any alleged confusion was confusion among individuals unfamiliar with Wish Atlanta, and was quickly dispelled by providing the caller with the email address for Contextlogic.

57.

To the extent that the evidence produced by Wish Atlanta could be construed as evidence of actual confusion, rather than evidence of inattentiveness on the part of a mistaken consumer calling the wrong entity, Wish Atlanta's evidence of alleged actual confusion is de minimis.  Wish Atlanta has engaged in numerous transactions since Contextlogic began operations, and has received thousands of telephone calls since Contextlogic first began use of its WISH trademark.  During that same period,

39

Contextlogic has assisted its users in millions of transactions through the Wish App and the website www.wish.com. To the extent there is evidence of actual confusion, it is de minimis. *See Duluth News-Tribune*, 84 F.3d at 1098 (finding evidence of occasional misdirected telephone calls and mail was de minimis).

58.

The Court emphasizes that Wish Atlanta presented no evidence that anyone familiar with or seeking to contact Wish Atlanta contacted Contextlogic instead.

59.

Finally, the Court acknowledges that Wish Atlanta presented Dr. Maronick as an expert witness testifying as to the alleged confusion caused by Contextlogic's adoption and use of its own WISH mark. The Court discounts Dr. Maronick's opinions relating to likelihood of confusion. Dr. Maronick used neither of the survey methods identified in *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 385-88 (7th Cir. 1976), *superseded by statute on other grounds as stated in Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1429 (7th Cir. 1985), or *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1089 n.4 (8th Cir. 1980). Trial Tr. vol. 1, 184:8-185:16; 189:13-19. He could not identify any published opinion endorsing his novel methodology. *Id.* at 185:17-25. Moreover, while Dr. Maronick purports to have found that survey participants identified a number of sources of

products offered under the word "wish"—some of which were non-existent entities made up by him—there is no evidence that any participant who associated the word "wish" with Wish Atlanta also associated the word with Contextlogic, or vice versa. *Id.* at 198:14–199:14. As a result, Dr. Maronick's opinion does not establish a likelihood of confusion between Wish Atlanta and Contextlogic.

60.

For all of these reasons, the actual confusion prong in the likelihood of confusion analysis is neutral.

H.   Summary of Factors

61.

Based on all of the factors discussed above, the Court concludes that Wish Atlanta has not carried its burden of establishing that Contextlogic created a likelihood of confusion among reasonable consumers when it adopted and used its own WISH mark. As a result, judgment shall be entered in Contextlogic's favor on Counts One, Two, Five through Eight, Ten and Eleven of the Amended Complaint.

II.  **Service Mark and Trade Name Dilution**

62.

In addition to its trademark infringement and unfair competition claims, Wish Atlanta also sues Contextlogic for service mark and trade name dilution under Georgia law. *See*

41

O.C.G.A. § 10-1-451(b).  Unlike the claims discussed above, Wish Atlanta need not prove that Contextlogic has created a likelihood of confusion to be entitled to relief under O.C.G.A. § 10-1-451(b).  Georgia law provides that the Court may enjoin "use by another of the same or any similar trademark, trade name, label, or form of advertisement if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the trademark [or] trade name . . . ."  O.C.G.A. § 10-1-451(b).

63.

The evidence has failed to establish that there is a "distinctive quality" in the word mark WISH used in connection with the sale of clothing and accessories sufficient to warrant protection under § 10-1-451(b).  As a result, Wish Atlanta cannot base its trademark dilution claim on that word mark. *See Giant Mart Corp.*, 247 Ga. at 777, 279 S.E.2d at 686 (holding that "the word 'Giant' is a descriptive term commonly used in the grocery business" that "may not be exclusively appropriated as part of a trade name").

64.

Similarly, any trade name claim based on Wish Atlanta's trade name WISH ATLANTA fails because the only component that name has in common with Contextlogic is the use of the word

42

"wish."  As discussed above, "wish" is a word commonly used in connection with the sale of clothing and apparel.

65.

To the extent that Wish Atlanta seeks to base a trademark dilution claim on its design mark, that claim fails because Contextlogic has not appropriated the distinctive quality of the mark, which is the design component of that mark.  Contextlogic uses a different design than Wish Atlanta, and its accent is on the "w" component of its mark rather than the "i" and "s" components.

66.

Wish Atlanta also appears to seek relief based on harm to its business reputation.  Specifically, Wish Atlanta points to generalized negative comments about Contextlogic in social media.  But Wish Atlanta presented no evidence that any of these comments had a negative impact on Wish Atlanta.  Moreover, Wish Atlanta's President admitted at trial that "if you go on a lot of stores [social media sites] you see negative comments." Trial Tr. vol. 1, 73:13-15.  There is simply insufficient evidence that any of Contextlogic's actions have harmed Wish Atlanta's business reputation.  Wish Atlanta has not proved its claim under O.C.G.A. § 10-1-451(b).

43

CONCLUSION

Based on the foregoing findings of fact and conclusions of law, judgment shall be entered in favor of Contextlogic as to all of the remaining claims contained in Wish Atlanta's Amended Complaint.  Contextlogic shall recover its costs.

IT IS SO ORDERED, this 2nd day of December, 2015.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA